# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JENNIFER LEE LAFAVOR,

      Plaintiff,

   v.

FRANK BISIGNANO,
Commissioner of Social Security,[1]

      Defendant.

_____/

Case No. 1:23-cv-00745-DJC-SKO

FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BE DENIED AND THE FINAL DECISION OF THE COMMISSIONER OF SOCIAL SECURITY BE AFFIRMED

(Doc. 18)

14-DAY DEADLINE

## I.   INTRODUCTION

Plaintiff Jennifer Lee Lafavor ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") under the Social Security Act (the "Act"). (Doc. 1.) The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

For the reasons set forth below, the undersigned recommends that Plaintiff's motion for

---

[1] On May 6, 2025, Frank Bisignano was appointed the Commissioner of the Social Security Administration.  *See* https://www.ssa.gov/news/press/releases/2025/#2025-05-07.  He is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

[2] The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302. On April 13, 2026, this case was reassigned to the undersigned.  (*See* Doc. 27.)

summary judgment be denied, and that the final decision of the Commissioner be affirmed.

## II.    BACKGROUND

Plaintiff was born in 1968, can communicate in English, has some college education, and previously worked as a communication manager.  (Administrative Record ("AR") 29, 104, 489.)  Plaintiff filed a claim for DIB payments on March 2, 2018, alleging she became disabled on September 8, 2017, due to mixed connective tissue disease, lupus, inflammatory arthritis, osteoporosis, dysautonomia, chest pain, syncope and near syncope, "PVCs," fatigue malaise, and "lack of focused forward thinking and concentration."  (AR 20, 182, 488.)

Following a hearing, an Administrative Law Judge (ALJ) issued a written decision on June 19, 2020, finding Plaintiff not disabled.  (AR 182–96.)  Plaintiff appealed the decision to the district court.  (AR 167–72.)  The parties thereafter voluntarily remanded the case for further proceedings.  (AR 168.)  On remand, the Appeals Council directed the assigned ALJ to conduct a *de novo* hearing, to take any further action needed to complete the record, and to issue a new written decision.[3]  (AR 175–76.)  The ALJ thereafter held a hearing and issued a new decision once again finding Plaintiff not disabled.  (AR 19–41.)

### A.    Relevant Evidence of Record[4]

#### 1.    Medical Evidence

In September 2017, Plaintiff presented to rheumatologist Sumeet Bhinder, M.D., for treatment of her systemic lupus erythematosus (SLE).  (AR 810.)  She was given an infusion of Benlysta,[5] having received her first dose the prior month.  (AR 810.)

Plaintiff was seen by cardiologist Jared M. Salvo, D.O., in October 2017.  (AR 733–35.)  Her diagnoses of SLE, mixed connective tissue disease (MCTD), and dysautonomia with recurrent neurocardiogenic syncope, as related to her autoimmune disorders, were noted.  (AR 733.)  Dr. Salvo also noted that Plaintiff had a "history of symptomatic [premature ventricular contractions

---

[3] The Appeals Council also noted that Plaintiff filed a subsequent claim for DIB on March 16, 2021, which was deemed duplicative and consolidated for purposes of the new decision.  (AR 176.)

[4] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

[5] "BENLYSTA is a prescription medicine for patients with active systemic lupus erythematosus (SLE or lupus) receiving other lupus medicines.  It is given intravenously or via an autoinjector patients can self-inject." *Fraga-Jimenez v. Saul*, No. 1:18-CV-00430-CWD, 2020 WL 1249877, at *10 (D. Idaho Mar. 16, 2020).

(PVCs)], which have been controlled with dofetilide."[6] (AR 733.) Dr. Salvo concluded that Plaintiff "requires prolonged periods of time of bedrest and many days missed from work." (AR 735.) That same month, Plaintiff received another dose of Benlysta from Dr. Bhinder in October 2017, and reported that other than insomnia, she was "handling it well." (AR 812.)

In November 2017, Plaintiff reported to Dr. Bhinder "better control of her lupus symptoms" and received another Benlysta infusion. (AR 814.) Plaintiff presented to Dr. Salvo in January 2018 complaining of dizziness, chest tightness, memory impairment, and "mental fogging." (AR 729–32, 760–63.) She had not had syncope since her last visit. (AR 729, 760.) On examination, Plaintiff demonstrated regular heart rate and rhythm, normal gait, nonfocal neurological findings, and good distal pulses, with no orthopnea, dyspnea, pedal edema, clubbing, or cyanosis. (AR 730, 761.) That next month, Plaintiff reported to Dr. Bhinder that she had "good control of symptoms on the current regimen" with "no major flare-ups." (AR 823.)

In March 2018, Plaintiff complained of insomnia and wished to discuss a recent diagnosis of shingles. (AR 1046–49.) She denied depression, anxiety, and suicidal thoughts. (AR 1048.) She was noted to be "pleasant" and alert and oriented, with appropriate speech and no confusion. (AR 1048.)

Plaintiff reported to Dr. Salvo for a follow up appointment in April 2018. (AR 914–17, 963–66, 1106–1109.) Her history of dysautonomia, neurocardiogenic syncope, and PVCs was noted. (AR 914, 963, 1106.) On examination, Plaintiff demonstrated regular heart rate and rhythm, normal gait, nonfocal neurological findings, and good distal pulses, with no orthopnea, dyspnea, pedal edema, clubbing, or cyanosis. (AR 915, 964, 1107.) That same month, Plaintiff presented for an appointment with Dr. Bhinder to treat her SLE. (AR 930–31.) Her physical examination was normal, with no murmurs, edema, abdominal tenderness, or visible synovitis. (AR 930.)

In May 2018, Plaintiff presented to Dr. Bhinder to treat her SLE, inflammatory arthritis, and MCTD. (AR 932–35.) Her physical examination showed tenderness in the glenohumeral joint but was otherwise normal. (AR 934.) Later that same month, Dr. Bhinder administered a Benlysta

---

[6] Dofetilide (brand name Tikosyn) is "used to correct irregular heartbeat of patients with atrial fibrillation or atrial flutter to a normal heart rhythm." DOFETILIDE (ORAL ROUTE) - SIDE EFFECTS & DOSAGE, https://www.mayoclinic.org/drugs-supplements/dofetilide-oral-route/description/drg-20063516 (last visited May 8, 2026).

infusion. (AR 936–37.) Her physical examination showed "fullness in the proximal interphalangeal joints of both hands." (AR 936.) Also in May 2018, Plaintiff complained of a foot injury. (AR 1033–35.) She denied anxiety, depression, and sleep difficulties, and her examination showed normal mood and affect, alert and oriented, and normal judgment and insight. (AR 1034.)

Plaintiff reported to Dr. Salvo in June 2018 an "escalation" in her presyncope/syncope, dizziness, and fatigue symptoms. (AR 918, 959.) Dr. Salvo observed she experienced a vagal episode during the examination, where she became diaphoretic, dizzy, and had to lie down. (AR 918, 959.) The examination results were normal, as before. (AR 919, 960.) That same month, Plaintiff reported generalized body pain to Dr. Bhinder. (AR 938–39.) On examination, "generalized muscle tenderness" was noted, but no synovitis was present. (AR 938.) Plaintiff reported experiencing a headache after the Benlysta infusion. (AR 939.) Later that month, Plaintiff reported to Dr. Bhinder "good control of symptoms" on her current regimen. (AR 940.) On examination, Plaintiff had no murmurs, edema, abdominal tenderness, or visible synovitis. (AR 940.)

In July 2018, Plaintiff received a Benlysta infusion from Dr. Bhinder. (AR 942–43, 985–88.) Her physical examination was normal, as before. (AR 942, 987.) Plaintiff presented for a follow up appointment with Dr. Bhinder in August 2018. (AR 989–90.) She complained of breakthrough joint pain. (AR 989–90.) On examination, Plaintiff showed no murmurs, edema, abdominal tenderness, or visible synovitis. (AR 989.)

Plaintiff presented to Dr. Salvo in September 2018. (AR 955–58, 1114–16.) She reported having had "six syncopal episodes" since she was last seen. (AR 955, 1114.) Her physical examination was normal, as before. (AR 956, 1115.) Dr. Salvo recommended that Plaintiff try the medication Northera.[7] (AR 957, 1116.) It was noted that a "[s]even-day Zio patch worn in September 2017 show[ed] sinus rhythm with occasional PACs and rare PVCs." (AR 957, 1116.) That same month, Plaintiff attended an appointment to receive a Benlysta infusion from Dr. Bhinder.

---

[7] Northera "is indicated for the treatment of orthostatic dizziness, lightheadedness, or the 'feeling that you are about to black out' in adult patients with symptomatic neurogenic orthostatic hypotension (nOH) caused by primary autonomic failure (Parkinson's disease [PD], multiple system atrophy, and pure autonomic failure), dopamine beta-hydroxylase deficiency, and non-diabetic autonomic neuropathy." NORTHERA® (DROXIDOPA) CAPSULES, FOR ORAL USE, https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/203202s007lbl.pdf (last accessed May 8, 2026).

4

(AR 991–92.) She reported weakness and bilateral knee and foot pain. (AR 991.) Her physical examination was normal. (AR 991.) An echocardiogram performed in October 2018 showed normal left ventricular size and function and no evidence of pulmonary hypertension. (AR 1139–40.)

In November 2018, Plaintiff reported to Dr. Salvo that she felt "at baseline" and had not had any syncopal episodes since he last saw her. (AR 1121.) On examination, Plaintiff demonstrated regular heart rate and rhythm, normal gait, nonfocal neurological findings, good distal pulses, with no orthopnea, dyspnea, pedal edema, clubbing, or cyanosis. (AR 1122.) It was noted that the medication Tikosyn (dofetilide) has been "effective" in controlling her PVCs. (AR 1123.)

Plaintiff attended a follow-up appointment with Dr. Salvo in December 2018, at which she reported that she had "received the Northera, but [had] not started it yet." (AR 1125.) Her physical examination was normal, as before. (AR 1126.) Dr. Salvo "strongly advised [Plaintiff] to start the Northera that was recently prescribed to her as an alternative to midodrine," and advised her to continue with her other medications, as they "have all been very helpful in controlling her autonomic dysfunction as well as to control her symptomatic PVCs." (AR 1127.)

In January 2019, Plaintiff was evaluated by a neurologist for cognitive impairment and sensory disturbances involving the skin and feet. (AR 1017–19.) On examination, "minimal impairment" of cognitive functions was noted. (AR 1017–18.) Normal neurological and sensory findings were also observed, and Plaintiff had normal strength except in her hands, where it was "4/5" and "-5/5" grip strength. (AR 1018.) Plaintiff's coordination and gait were normal. (AR 1018.)

Plaintiff presented to Dr. Bhinder in February 2019 for a Benlysta infusion. (AR 1062.) She reported "overall good control of her symptoms" with no "major flare ups." (AR 1062.) Her physical examination was normal, with no murmurs, edema, abdominal tenderness, or visible synovitis. (AR 1062.)

In March 2019, Dr. Salvo noted that Plaintiff "was supported to have received a trial of Northera," but she "thinks that [it] may have been stolen or inadvertently thrown out," as she never received it. (AR 1129.) On examination, Plaintiff demonstrated regular heart rate and rhythm,

5

normal gait, nonfocal neurological findings, good distal pulses, with no orthopnea, dyspnea, pedal edema, clubbing, or cyanosis. (AR 1130.)  That same month, Plaintiff received a Benlysta infusion from Dr. Bhinder. (AR 1064.)  She again reported "overall good control of symptoms on the current regimen" and "[n]o major flare-ups."  (AR 1064.)  Plaintiff's physical examination was normal. (AR 1064.)

Plaintiff reported fatigue symptoms to Dr. Bhinder in May 2019.  (AR 1068–69.)  Her physical examination was normal, with no murmurs, edema, abdominal tenderness, or visible synovitis.  (AR 1068.)

In June 2019, Plaintiff reported to Dr. Salvo that she had a syncopal episode two weeks prior but had not had a syncope while seated or driving as she has "done okay" with these activities.  (AR 1133.)  She reported her Northera prescription "lost," and the Northera representative indicated that they were unable to get in touch with the Plaintiff, so her "prescription case" was "closed."  (AR 1133.)  Her physical examination findings were normal, as before.  (AR 1135.)  That same month, Plaintiff reported fatigue and hip pain to Dr. Bhinder.  (AR 1070.)  On physical examination, Plaintiff showed no murmurs, edema, abdominal tenderness, or visible synovitis.  (AR 1070.)

Plaintiff reported to Dr. Bhinder in July 2019 that she had a "flare up" with a low-grade temperature.  (AR 1072.)  Her physical examination was normal.  (AR 1072.)  That next month, Plaintiff attended a follow-up appointment with Dr. Bhinder, where she reported "overall stable control of her symptoms" and no "major flare ups."  (AR 1075.)  Her physical examination was normal, as before.  (AR 1075.)  That same month, Plaintiff complained of neck pain.  (AR 1054.)  On examination, she had neck tenderness and limited range of motion, but was otherwise "pleasant," and alert and oriented, with appropriate speech and no confusion.  (AR 1056–57.)

In September 2019, Dr. Bhinder observed Plaintiff had been seen for flare ups twice since her last Benlysta infusion.  (AR 1084.)  She reported "good control of her symptoms" and no "major flare ups" since last visit.  (AR 1084.)  Plaintiff had a normal physical examination.  (AR 1084.)  Plaintiff established care with a new primary care physician in November 2019.  (AR 1156–58.)  She complained of finger numbness and chronic neck pain.  (AR 1156.)  On physical examination, she exhibited regular heart rate and rhythm, normal respiration, nontender abdomen, and no

cyanosis, clubbing, or edema.  (AR 1157.)

Plaintiff presented for an appointment to review cervical spine MRI results in January 2020. (AR 1162–64.)  She complained of neck pain and bilateral finger numbness, but denied syncope, joint pain, anxiety, and depression.  (AR 1162.)  Her physical examination was normal, with normal neurological findings, regular heart rate and rhythm, clear lungs, and normal stance and gait.  (AR 1162–63.)  Later that month, Dr. Bhinder observed that her MRI shows some degenerative joint disease and previous fusion at C6-C7, and some stenosis and foraminal narrowing with a broad-based disk bulge at C4-C5.  (AR 1233.)  It was noted that she was tolerating the Benlysta infusions "well."  (AR 1233.)  On examination, Plaintiff had an antalgic gait and mild joint synovitis and swelling in her hands bilaterally.  (AR 1233–34.)

In February 2020, Plaintiff presented to a rheumatology clinic for treatment of her SLE by Mariko Ishimori, M.D.  (AR 1190–1201.)  She complained of difficulty standing up, issues focusing on tasks, joint pain, and fatigue.  (AR 1190.)  Plaintiff reported that Benlysta "helps somewhat." (AR 1191.)  Dr. Ishimori suspected that her current symptoms "are likely more secondary to her POTS, as there is not a lot of evidence of lupus activity."  (AR 1195.)  She was advised to pause use of Benlysta to observe her symptoms.  (AR 1195.)  Later that month, Plaintiff presented to Dr. Bhinder complaining that since Dr. Ishimori told her to pause use of Benlysta, she has experienced low-grade fever, joint pain, mouth sores, and itchy skin.  (AR 1231.)  Her physical examination was normal.  (AR 1231.)

Plaintiff reported to Dr. Salvo in March 2020 for a follow up appointment.  Her history of SLE, POTS, and recurrent neurocardiogenic syncope was noted.  (AR 1225.)  Plaintiff reported that her symptoms have been "so severe that she has been unable to maintain gainful employment, has a lot of syncopal episodes, dizziness, and fatigue."  (AR 1225.)  Plaintiff's physical examination was normal, with regular heart rate and rhythm, normal gait, and good distal pulses, with no pedal edema, clubbing, or cyanosis.  (AR 1226.)  Dr. Salvo noted that the Northera that she was given the previous year "made a remarkable improvement in her quality of life and amelioration of her symptoms related to POTS," but "[u]nfortunately her insurance has stopped paying for [it]."  (AR 1227.)  He "strongly advised that [Plaintiff] be placed back on Northera instead of midodrine as it

was better tolerated, more effective, and overall improved her quality of life." (AR 1227.) Dr. Salvo noted that Plaintiff will continue her other medications, which have been "effective at controlling her PVCs." (AR 1227.) That same month, Plaintiff presented to Dr. Bhinder, who noted that, per Dr. Ishimori, "most of her symptoms are due to POTS flare up." (AR 1252, 1255.) Plaintiff stated that without Benlysta, she believed she was in "flare up," with fatigue and achiness. (AR 1257.) A physical examination was normal, with no joint swelling but some "puffiness" in her hands. (AR 1252, 1255, 1258.)

In June 2020, Plaintiff presented for an appointment via videoconference with Dr. Salvo. (AR 1351–54.) She reported resuming Northera, but she did not tolerate a higher dose due to headaches. (AR 1351.) Dr. Salvo noted that Plaintiff "did not go to the lower dose for some reason and instead has been back on midodrine." (AR 1351.) He recommended that she resume Northera at the lower dose, as it was "highly effective in the past." (AR 1354.) It was also noted that Plaintiff continues to take Tikosyn (dofetilide), which "has been the only effective anti-arrhythmic agent in controlling tier symptomatic PVCs." (AR 1354.)

Plaintiff attended another videoconference appointment with Dr. Salvo in November 2020. (AR 1356–60.) She reported that her headaches persisted despite having ceased taking Northera. (AR 1356.) It was noted that Plaintiff was "still taking pyridostigmine, fludrocortisone, and . . . flecainide for symptomatic PVCs," which has been "highly effective and continues to control her ventricular ectopy." (AR 1356.) Dr. Salvo advised Plaintiff to "go back on Northera" as it had "really been the only medication that has been effective and reasonably tolerated." (AR 1359.)

In December 2020, Plaintiff presented for a videoconference appointment with Dr. Salvo. (AR 1361–64.) It was noted that her "PVCs have only been controlled by dofetilide," and Plaintiff reported that "midodrine has been reasonably effective," and "now she is doing okay." (AR 1361.) She denied any syncope or presyncope since last visit. (AR 1361.) Dr. Salvo deemed her "clinically stable." (AR 1364.) A cardiac event monitor report from that month noted two stable and no critical or serious events. (AR 1373.) That same month, an echocardiogram report showed normal left ventricular size, normal systolic function, no evidence of pulmonary hypertension, normal interior vena cava, and no pericardial effusion. (AR 1371–72.)

Plaintiff requested a refill of dofetilide from Dr. Salvo in March 2021, as her "last ambulatory monitor show[ed] excellent control of her ventricular ectopy with [the medication]." (AR 1366.)  She reported only occasional pre-syncopal episodes, and no palpitations.  (AR 1366.)

In June 2021, Plaintiff attended a routine follow up appointment with her primary care physician via videoconference.  (AR 1548–50.)  Her physical examination was normal, with well-groomed appearance; pleasant, alert, and cooperative behavior; and normal range of motion in her neck and extremities.  (AR 1549.)

Plaintiff presented to cardiologist Chirag Desai, M.D., in July 2021.  (AR 1701–1703.)  She reported having syncopal spells "every two weeks or so," including "one in the exam room during the interview."  (AR 1701.)  Dr. Desai noted that Plaintiff is not using compression stockings "because she feels that make her overheated."  (AR 1701.)  On examination, Dr. Desai noted that Plaintiff showed normal cardiac, vascular, and neurological results, with normal range of motion and strength and appropriate mood and affect.  (AR 1702.)

In August 2021, Plaintiff presented to an orthopedist for evaluation of left shoulder pain.  (AR 1711–16, 1901–1906.)  Her physical examination showed increased stiffness, swelling, and tenderness anteriorly consistent with impingement of the left rotator cuff, as well as weakness of the supraspinatus.  (AR 1715, 1905.)  The examination was otherwise normal, with normal gait.  (AR 1714–15, 1904–1905.)

That same month, Plaintiff presented for a comprehensive psychiatric evaluation with C. Eisen, M.D. (AR 1872–75.)  She reported feeling depressed, sad, irritable, angry, helpless, hopeless, and has difficulty enjoying herself, decreased pleasure, suicidal ideation, anxiety, and racing thoughts.  (AR 1872.)  She acts "isolative" due to the embarrassment of her physical condition.  (AR 1872.)  According to Plaintiff, she has impaired concentration and finds that her mind "goes blank" sometimes.  (AR 1872.)  She reported that she spoke to a counselor once, but did not follow up, and does not have a current counselor or psychiatrist.  (AR 1873.)  As for her activities, Plaintiff stated that her family helps with chores, she can use the microwave for meals, and she will "rarely drive." (AR 1873.)  On examination, Dr. Eisen noted Plaintiff was cooperative and exhibited normal eye contact.  (AR 1874.)  She was able to repeat 1/5 objects forward, 0/5 backwards, and recalled 1/3

items after a five-minute delay.  (AR 1874.)  She could perform multiplication and subtraction problems but was not able to complete serial 3s or 7s calculations.  (AR 1874.)  Plaintiff was able to complete a three-step command and could spell the word "world" forward and backward.  (AR 1874.)

In September 2021, Plaintiff presented to Dr. Salvo.  (AR 2416–22.)  It was noted that "dofetilide was finally able to control her symptomatic ectopy," she was "briefly on Northera for a period of time" but it caused "worsening headaches," and so she had to transition back to midodrine, which was "better tolerated."  (AR 2416.)  Plaintiff's palpitations were "controlled on dofetilide." (AR 2416.)  Her examination was normal as before, with normal gait and equal strength in all four extremities.  (AR 2420.)  That same month, Plaintiff attended an appointment with neurologist Maheep Singh Birdi, M.D., to establish care for amnesia.  (AR 1972–74.)  On examination, Plaintiff demonstrated normal strength, sensation, and gait.  (AR 1972–73.)

Plaintiff reported to Dr. Birdi for EEG results in November 2021, which were normal.  (AR 1969–70.)  She stated that she is "doing well," that her memory is "fine at times," but she still experiencing dizziness and headaches.  (AR 1969.)  On examination, Plaintiff showed no disorientation, normal strength and sensation, and normal gait.  (AR 1969.)  That same month, Plaintiff complained of neck and back pain to a pain specialist.  (AR 2060–65.)  Plaintiff's examination showed normal gait, strength, and sensation, with tenderness and restricted range of motion in her neck and back.  (AR 2064.)

In December 2021, Plaintiff requested clearance for left shoulder surgery later that month. (AR 2154.)  She denied anxiety and depression.  (AR 2155.)  Her physical examination was normal, and she was observed to be "cooperative," with normal mood and affect.  (AR 2155.)  Plaintiff was deemed to be medically stable to proceed with the surgery.  (AR 2156.)  Plaintiff also participated in physical therapy for her left shoulder that month.  (AR 2073–85.)

Plaintiff again complained to another pain specialist of neck and low back pain in January 2022.  (AR 2515–20.)  She reported that physical therapy on her left shoulder was "difficult."  (AR 2518.)  Plaintiff's examination showed good judgment, normal mood and affect, normal gait, strength, and sensation, with tenderness and restricted range of motion in her neck and back.  (AR

2519.)

In February 2022, at a neurosurgery consult, it was noted that Plaintiff "underwent cervical injections and chose to forgo therapeutic sacroiliac joint infection of the left side since primary complaint since last visit is now her neck pain." (AR 2544.) Reduced strength and joint pathology were present on examination, as well as normal reflexes. (AR 2547.) Plaintiff reported to Dr. Salvo during a videoconference that same month that she has been "unable to maintain upright posture for meaningful periods of time," that she "cannot exercise," and that she must "lie down frequently because of her orthostasis." (AR 2410.) According to Plaintiff, Northera caused an "excessive rise in blood pressure." (AR 2410.) She complained of "diffuse arthralgia and myalgia," and that a COVID-19 infection caused a "lupus flare." (AR 2410.) Dr. Salvo noted that Plaintiff was "under the careful guidance of Dr. Bhinder for rheumatology services." (AR 2410.) He concluded that she had a "frequent requirement" to lie down to "avoid passing out." (AR 2415.)

### 2.    Opinion Evidence

In January 2018, Dr. Salvo completed a "Functionality Form" and "Physical Capabilities Evaluation" for Plaintiff's insurer. (AR 764–66.) He stated that Plaintiff "cannot maintain [an] upright posture either sitting or standing for more than a few minutes due to frequent passing out episodes that were unpredictable," and that her condition "also caused severe mental clouding and inability to focus," causing her to "miss work on a weekly basis." (AR 764.) Dr. Salvo further opined that Plaintiff could sit, stand, or walk zero hours in an eight-hour day, and could do no lifting, carrying, pushing, pulling, bending, stooping, squatting, crouching, kneeling, crawling, climbing, or use the bilateral hands for firm grasping, fine manipulation, fingering/keying, or pushing/pulling. (AR 765.) He indicated she could not use her feet for leg controls; and could not work at heights, operate heavy machinery, maintain balance, be exposed to vibration, operate computers, be exposure to marked temperature changes, or be exposed to dust, fumes, gases, or chemicals. (AR 765–66.)

In August 2021, State agency consulting expert Phaedra Carusa-Radin, Psy.D., opined that Plaintiff had a mild limitation in her ability to concentrate, persist, or maintain pace. (AR 218.) That same month, following their comprehensive examination, Dr. Eisen opined that Plaintiff had

11

moderate limitations in interacting with coworkers and the public, in performing work activities on a consistent basis, in maintaining regular attendance and completing a normal workday/workweek, and in dealing with the usual stress encountered in the workplace. (AR 1875.) Dr. Eisen further assessed a mild level of limitation in Plaintiff's ability to perform both simple and repetitive tasks, detailed and complex tasks, and in her ability to accept instructions from supervisors. (AR 1875.)

State agency consulting expert Uwe Jacobs affirmed the mild limitation opined by Dr. Carusa-Radin in January 2022 (AR 242–43). In March 2022, Dr. Salvo completed a "Disability Impairment Questionnaire." (AR 2434–38.) He opined that Plaintiff could sit, stand, and walk for less than one hour; lift no more than 10 pounds; must alternate positions and elevate her legs to at least chest height; never grasp, turn, or twist objects; only occasionally perform fine manipulations; never reach overhead; requires four or more unscheduled breaks of 10–15 minutes and more than three absences per month. (AR 2436–38.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on June 1, 2018, and again on reconsideration on August 16, 2018. (AR 182, 255–259, 262–67.) Following a hearing, an Administrative Law Judge (ALJ) issued a written decision on June 19, 2020, finding Plaintiff not disabled. (AR 182–196.) Plaintiff appealed the decision to the district court. (AR 167–72.) The parties thereafter voluntarily remanded the case for further proceedings. (AR 168.) On remand, the Appeals Council directed the assigned ALJ to conduct a *de novo* hearing, to take any further action needed to complete the record, and to issue a new written decision. (AR 175–76.)

At a hearing held on March 24, 2022, Plaintiff appeared via teleconference with counsel and testified before an ALJ as to her alleged disabling conditions. (AR 65–94, 100–102.) Plaintiff testified at the hearing, *inter alia*, that she can drive approximately seven miles to doctor's appointments and back, but that she tries not to drive very often by herself. (AR 85.) A vocational expert (VE) also testified at the hearing. (AR 94–100.)

**C.    The ALJ's Decision**

In a decision dated April 28, 2022, the ALJ once again found that Plaintiff was not disabled, as defined by the Act. (AR 19–42.) The ALJ conducted the five-step disability analysis set forth in

20 C.F.R. § 404.1520.  (AR 22–42.)  The ALJ decided that Plaintiff met the insured status requirements of the Act through December 31, 2023, and had not engaged in substantial gainful activity since September 8, 2017, the alleged onset date (step one).  (AR 22.)  At step two, the ALJ found Plaintiff's following impairments to be severe: "systemic lupus erythematosus (SLE); mixed connective tissue disease (MCTD); rheumatoid arthritis (RA); degenerative disc disease of the cervical spine; dysautonomia; postural orthostatic tachycardia syndrome (POTS); premature ventricular contractions (PVCs)"; and beginning July 2021, "left shoulder adhesive capsulitis."  (AR 22–27.)  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 27–28.)

The ALJ assessed Plaintiff's residual functional capacity (RFC)[8] and applied the assessment at steps four and five.  *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff had the RFC:

> to perform light work as defined in 20 [§] CFR 404.1567(b), including lifting and/or carrying 20 pounds occasionally and 10 pounds frequently, except [Plaintiff] can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. She can never climb ladders, ropes, or scaffolds.  She can tolerate occasional exposure to working in extreme cold and in extreme heat, to work at unprotected heights, and to operating heavy machinery.  As of July 15, 2021, an additional limitation of no more than frequent overhead reaching bilaterally also applies.

(AR 28–41.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause some of the alleged symptoms[,]" the ALJ rejected Plaintiff's subjective testimony as "not entirely consistent with the objective medical and other evidence for the reasons explained in

---

[8] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

13

this decision."  (AR 30.)

Based on testimony from the VE, the ALJ determined that Plaintiff could perform her past relevant work as an emergency medical services coordinator (step four).  (AR 41.)  The ALJ ultimately concluded Plaintiff was not disabled from September 8, 2017, through the date of the decision.  (AR 41–42.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on March 30, 2023.  (AR 1–7.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981.

### III.      LEGAL STANDARD

### A.      Applicable Law

An individual is considered "disabled" for purposes of disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that [they] are not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act."  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing [their] past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds

14

to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [their] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence . . . is 'more than a mere scintilla,'" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)). Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing

both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.    DISCUSSION

Plaintiff contends that the ALJ erred in their assessment of the medical opinion of treating cardiologist Dr. Salvo, and in failing to account for Plaintiff's mental impairments when assessing the RFC. (Doc. 18; Doc. 25.) The Commissioner responds that the ALJ's consideration of the medical opinion was proper and supported by substantial evidence and that they properly assessed Plaintiff's mental impairments. (Doc. 24.) The undersigned agrees with the Commissioner.

### A.    The ALJ's Treatment of Dr. Salvo's Opinion Was Not Erroneous

#### 1.    Legal Standard

Plaintiff's claim for DIB is governed by the agency's regulations concerning how ALJs must evaluate medical opinions for claims filed on or after March 27, 2017. 20 C.F.R. § 404.1520c. The regulations set "supportability" and "consistency" as "the most important factors" when determining the opinions' persuasiveness. 20 C.F.R. § 404.1520c(b)(2). And although the regulations eliminate the "physician hierarchy," deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [they] considered the medical opinions" and "how persuasive [they] find all of the medical opinions." 20 C.F.R. § 404.1520c(a)–(b).

The Ninth Circuit has issued the following guidance regarding treatment of physicians' opinions after implementation of the revised regulations:

> The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant. Our requirement that ALJs provide

16

"specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions is likewise incompatible with the revised regulations. Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

*Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022) (internal citations omitted). Accordingly, under the new regulations, "the decision to discredit any medical opinion, must simply be supported by substantial evidence." *Id*. at 787.

In conjunction with this requirement, "[t]he agency must 'articulate . . . how persuasive' it finds 'all of the medical opinions' from each doctor or other source, and 'explain how [it] considered the supportability and consistency factors' in reaching these findings." *Woods*, 32 F.4th at 792 (citing 20 C.F.R. § 404.1520c(b)). "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" *Id*. at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1)). *See also id*. § 416.920c(c)(1). "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Id*. at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)). *See also id*. § 416.920c(c)(2).

As the Ninth Circuit also observed,

The revised regulations recognize that a medical source's relationship with the claimant is still relevant when assessing the persuasiveness of the source's opinion. *See id.* § 404.1520c(c)(3). Thus, an ALJ can still consider the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely reviewed the claimant's records. *Id*. § 404.1520c(c)(3)(i)–(v). However, the ALJ no longer needs to make specific findings regarding these relationship factors:

*Woods*, 32 F.4th at 792. "A discussion of relationship factors may be appropriate when 'two or more medical opinions . . . about the same issue are . . . equally well-supported . . . and consistent with the record . . . but are not exactly the same.'" *Id*. (quoting § 404.1520c(b)(3)). *See also id*. § 416.920c(b)(3). "In that case, the ALJ 'will articulate how [the agency] considered the other most persuasive factors.'" *Id*. Finally, if the medical opinion includes evidence on an issue reserved to the Commissioner, the ALJ need not provide an analysis of the evidence in their decision, even in the discussions required by 20 C.F.R. § 404.1520c. *See* 20 C.F.R. § 404.1520b(c)(3).

With these legal standards in mind, the undersigned reviews the consideration of the medical opinion of Dr. Salvo.

### 2.    Analysis

In considering treating cardiologist Dr. Salvo's opinions related to Plaintiff's physical functioning, the ALJ determined that they were not persuasive because they were "not supported by his records" and "not consistent with the record." (AR 39, 40.)  The undersigned finds that the ALJ properly evaluated the supportability and consistency of Dr. Salvo's opinions.[9]

Regarding supportability, the ALJ determined that Dr. Salvo's opinions that Plaintiff is limited to one hour or less of sitting, standing, or walking in an eight-hour day and would be absent more than three times per month were not supported by his records showing "good response to treatment" and "minimal to normal exam findings." (AR 39, 40.)  For the former finding, the ALJ relied on regularly documented instances by Dr. Salvo throughout the relevant period showing Plaintiff's SLE, PVCs, POTS, and syncope symptoms were controlled with medication (*see* AR 733 (October 2017: PVCs "have been controlled with dofetilide"); AR 729, 760 (January 2018: no syncope episodes since last visit): AR 1121, 1123 (November 2018: Plaintiff "at baseline," no syncope episodes since last visit, and Tikosyn (dofetilide) has been "effective" in controlling her PVCs); AR 1127 (December 2018: medications "have all been very helpful in controlling her autonomic dysfunction as well as to control her symptomatic PVCs"); AR 1133 (June 2019: no syncope while seated or driving and has "done okay" with these activities); AR 1227 (March 2020: Northera "made a remarkable improvement in her quality of life and amelioration of her symptoms related to POTS" and other medications have been "effective at controlling her PVCs."); AR 1354 (June 2020: Northera was "highly effective in the past" and Tikosyn (dofetilide) "has been the only effective anti-arrhythmic agent in controlling tier symptomatic PVCs."); AR 1356 (November 2020: medications for PVCs have been "highly effective and continues to control her ventricular ectopy" and Northera "effective and reasonably tolerated"); AR 1361, 1364 (December 2020: PVCs have

---

[9] The undersigned's consideration of Dr. Salvo's opinions does not include his conclusions that Plaintiff could not maintain gainful employment, return to work, or continue with her job, which, as the ALJ notes (AR 38–39), constitute evidence on an issue reserved to the Commissioner and is therefore neither "valuable nor persuasive."  20 C.F.R. § 404.1520b(c)(3).

been "controlled by dofetilide," "midodrine has been reasonably effective," "now [Plaintiff] is doing okay," denying any syncope or presyncope since last visit, and deemed "clinically stable."); AR 1366 (March 2021: "last ambulatory monitor show[ed] excellent control of her ventricular ectopy with [dofetilide]," and reporting only occasional pre-syncopal episodes and no palpitations); AR 2416 (September 2021: "dofetilide was finally able to control her symptomatic ectopy," she was "briefly on Northera for a period of time" but had to transition back to midodrine, which was "better tolerated," and palpitations were "controlled on dofetilide.")). *See Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for [Social Security] benefits."). That is, when Plaintiff adhered to her medication regimen: as the ALJ observed, "despite alleging debilitating syncope/presyncope," there is evidence in the record that Plaintiff did not take her "highly effective" medication, despite Dr. Salvo's recommendations to do so (*see* AR 39–40 (citing AR 1125 ("strongly advis[ing] [Plaintiff] to start the Northera that was recently prescribed to her as an alternative to midodrine," as she "received the [it], but [had] not started it yet."); AR 1354 (noting Plaintiff "did not go to the lower dose [of Northera] for some reason and instead has been back on midodrine" and recommending that she resume Northera at the lower dose.))). *See Garcia v. Comm'r of Soc. Sec.*, No. 1:22-CV-01205-EPG, 2023 WL 8113836, at \*5 (E.D. Cal. Nov. 22, 2023) (upholding ALJ's finding medical opinion "less persuasive" because the record showed the plaintiff "was not always compliant with treatment.")

As to the ALJ's latter finding of lack of support by Dr. Salvo's examinations, the ALJ cited treatment notes demonstrating consistently normal physical findings by Dr. Salvo during in-person visits throughout the relevant period.[10] (*See* AR 957, 1116 (September 2017: "[s]even-day Zio patch worn in September 2017 show[ed] sinus rhythm with occasional PACs and rare PVCs."); AR 730, 761 (January 2018: regular heart rate and rhythm, normal gait, nonfocal neurological findings, and good distal pulses, with no orthopnea, dyspnea, pedal edema, clubbing, or cyanosis); AR 915, 964, 1107 (April 2018: same); AR 919, 960 (June 2018: same, despite experiencing a "vagal episode"

---

[10] Plaintiff also saw Dr. Salvo for videoconference appointments due to the COVID-19 pandemic, during which no physical examinations were performed. (*See, e.g.*, AR 1351–54, 1356–60, 1361–64, 2410.)

during the examination); AR 956, 1115 (September 2018: same, despite having reported "six syncopal episodes" since last visit); AR 1122 (November 2018: same); AR 1126 (December 2018: same); AR 1130 (March 2019: same); AR 1135 (June 2019: same, despite having reported a syncopal episode two weeks prior); AR 1226 (March 2020: same); AR 2420 (September 2021: same, with equal strength in all four extremities).)

The ALJ also found Dr. Salvo's opinions were generally inconsistent with the rest of the medical record, which contains "routine" and "unremarkable" physical findings throughout the relevant period, as well as "evidence that treatment for the allegedly disabling symptoms has been significantly helpful." (AR 39.)  In support of these findings, the ALJ cited records from a variety of other treatment providers, who, like Dr. Salvo, documented benign examination and objective findings throughout the relevant period. (*See* AR 930 (April 2018: no murmurs, edema, abdominal tenderness, or visible synovitis) AR 934 (May 2018: tenderness in the glenohumeral joint but otherwise normal); AR 940 (June 2018: no murmurs, edema, abdominal tenderness, or visible synovitis); AR 942, 987 (July 2018: same); AR 989 (August 2018: same); AR 991 (September 2018: same); AR 1139–40 (October 2018: echocardiogram showed normal left ventricular size and function and no evidence of pulmonary hypertension); AR 1018 (January 2019: normal neurological and sensory findings, normal strength except "4/5" and "-5/5" grip strength in the hands, and normal coordination and gait); AR 1062 (February 2019: no murmurs, edema, abdominal tenderness, or visible synovitis); AR 1063 (March 2019: same); AR 1068 (May 2019: same); AR 1070 (June 2019: same); AR 1072 (July 2019: same, despite report of "flare up"); AR 1075 (August 2019: same); AR 1084 (September 2019: same); AR 1157 (November 2019: regular heart rate and rhythm, normal respiration, nontender abdomen, and no cyanosis, clubbing, or edema); AR 1162–63 (January 2020: normal neurological findings, regular heart rate and rhythm, clear lungs, and normal stance and gait); AR 1231 (February 2020: no murmurs, edema, abdominal tenderness, or visible synovitis); AR 1252, 1255, 1258 (March 2020: some "puffiness" but no joint swelling); AR 1371–73 (December 2020: echocardiogram report showing normal left ventricular size, normal systolic function, no evidence of pulmonary hypertension, normal interior vena cava, and no pericardial effusion; cardiac event monitor report noting two stable and no critical or serious events); AR 1549 (June 2021: well-

20

groomed appearance; pleasant, alert, and cooperative behavior; and normal range of motion in her neck and extremities); AR 1702 (July 2021: normal cardiac, vascular, and neurological results, with normal range of motion and strength and appropriate mood and affect, despite experiencing a syncopal spell during the interview); AR 1714–15, 1904–1905 (August 2021: shoulder tenderness and swelling, otherwise normal with normal gait); AR 1972–73 (September 2021: normal strength, sensation, and gait); AR 1969 (November 2021: no disorientation, normal strength and sensation, and normal gait); AR 2064 (normal gait, strength, and sensation, with tenderness and restricted range of motion in her neck and back.); AR 2519 (January 2022: same); AR 2547 (February 2022: reduced strength with normal reflexes).  The ALJ also pointed to the inconsistency between Plaintiff's abilities to drive a car (AR 85, 513, 556, 648, 1873) and to participate in physical therapy (AR 2073–85) and Dr. Salvo's opinions that she cannot use her feet for leg controls (AR 766), cannot maintain an upright posture while sitting "for more than a few minutes" (AR 765, 2436), and must elevate her legs three to four times a day (AR 2426) due to syncope/presyncope symptoms.

As the ALJ further found, the medical record also contains evidence from other providers that Plaintiff's treatment has significantly improved her symptoms. (*See* AR 812 (October 2017: Plaintiff "handling [dose of Benlysta] well"); AR 814 (November 2017: "better control of her lupus symptoms" on Benlysta); AR 823 (December 2017: "good control of symptoms on the current regimen" with "no major flare-ups"); AR 940 (June 2018: "good control of symptoms" on her current regimen, despite having a vagal episode earlier in the month); AR 1062 (February 2019: "overall good control of her symptoms" with no "major flare ups"); AR 1064 (March 2019: same); AR 1075 (August 2019: same, despite having had a "flare up" the month before); AR 1084 (September 2019: "good control of her symptoms" and no "major flare ups," despite having had two "flare ups" since her last Benlysta infusion); AR 1233 (January 2020: Plaintiff tolerating the Benlysta infusions "well"); AR 1191 (February 2020: Benlysta "helps somewhat"); AR 1969 (November 2021: "doing well" and memory "fine at times"); AR 2156 (December 2021: deemed medically stable to proceed with left shoulder surgery); *cf*. AR 1231(February 2020: experiencing low-grade fever, joint pain, mouth sores, and itchy skin after pausing Benlysta); AR 1257 (March 2020: without Benlysta, Plaintiff experiencing "flare up" with fatigue and achiness); AR 1701 (July 2021: Plaintiff not using

compression stockings, reporting having syncopal spells "every two weeks or so").)

Plaintiff asserts that the ALJ's persuasiveness analysis of Dr. Salvo's opinion is based on a "mischaracterization of the evidence" and "cherry pick[ed]" examples of improvement while "ignore[ing]" other evidence of the frequency and severity of her impairments.  (Doc. 18 at 24, 27, 29; Doc. 25 at 2.)  But "in interpreting the evidence and developing the record, the ALJ does not need to discuss every piece of evidence."  *Howard ex rel. Wolff v. Barnhart,* 341 F.3d 1006, 1012 (9th Cir. 2003) (internal quotation marks and citations omitted).  Plaintiff references select portions of the record—most of which was considered and discussed by the ALJ—and offers her competing interpretations to establish error.  However, the ALJ, not the Court, is responsible for weighing evidence and resolving conflicts.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  Where, as here, the ALJ did so and the record supports their conclusions, the conclusions should be upheld.  *See Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  This is so even if Plaintiff's interpretation of the evidence is rational.  *See Ford*, 950 F.3d at 1154; *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1196 (9th Cir. 2004).  Although Plaintiff clearly expected more favorable findings, the ALJ's discussion sufficiently demonstrates that they did not arbitrarily reject Dr. Salvo's opinions.  *See Crane v. Shalala*, 76 F.3d 251, 254 (9th Cir. 1996).

Plaintiff also argues that "notations indicating that a claimant is doing well or is stable do not contradict a treating physician's opinion of a claimant's functional limitations."  (Doc. 18 at 25 (quoting *Martinez v. Comm'r of Soc. Sec.*, No. 1:20-CV-00439-GSA, 2021 WL 2915018, at \*6 (E.D. Cal. July 12, 2021)); *see also* Doc. 25 at 3.)  While this may be true, the ALJ in this case did not predicate their persuasiveness finding on evidence that Plaintiff was generally "doing well."  Instead, they relied on specific treatment records from Dr. Salvo and other providers demonstrating the effectiveness of treatment in controlling her symptoms.  (*See* AR 39–40.)  Plaintiff further asserts that the ALJ did not understand the "complex nature" of her disorders and therefore erred by focusing on the lack of "specific examination findings to confirm [their] severity."  (Doc. 18 at 26; *see also* Doc. 25 at 1.)  This argument is misplaced.

A plain reading of the ALJ's decision indicates that they did not find that there was a lack of evidence to support Dr. Salvo's opinion, but rather, that the evidence actively contradicted it.

22

Moreover, contrary to Plaintiff's argument, the ALJ did not rely solely on "examination findings" to conclude that Dr. Salvo's opinions were not persuasive.  The ALJ also considered the extent to which the objective testing, including cardiac event monitor reports and echocardiogram results, lent support, or lack thereof, to the opinions (*see* AR 39, 40).[11]  *Cf. Nutter v. Berryhill*, No. 1:17-CV-00242-JLT, 2018 WL 4043204, at *12 (E.D. Cal. Aug. 23, 2018) (finding ALJ erred by failing to identify any objective evidence that conflicted with physician's opined limitations due to POTS).

Finally, Plaintiff contends that the ALJ "failed to connect [their] conclusions to the specific evidence and explain how the evidence supports that conclusion," citing *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).[12]  (Doc. 18 at 30–31.)  *Embrey* is distinguishable.  In *Embrey,* the court held that an ALJ's conclusion that objective findings do not support a treating physician's opinion is alone not a sufficiently specific reason to reject that opinion.  849 F.2d at 421–22.  Here, the ALJ did not merely summarily conclude that Dr. Salvo's opinions were inconsistent with medical record; he instead identified specific medical evidence—such as Plaintiff's ability to drive to medical appointments and to attend physical therapy sessions—that demonstrate that, contrary to Dr. Salvo's assessments, Plaintiff can, for example, use her feet for leg controls and sit for "more than a few minutes"(AR 39, 40).  *Cf. Nutter*, 2018 WL 4043204, at *12.

Based on the foregoing, the undersigned concludes that the ALJ's finding that Dr. Salvo's opinions were both unsupported by his treatment records and inconsistent with the medical record as a whole is legally sufficient and supported by substantial evidence.  It was therefore reasonable for the ALJ to determine that the record did not support the severity of Dr. Salvo's opined restrictions.

---

[11] The ALJ also observed that Dr. Salvo's opinions were based on Plaintiff's subjective complaints.  (*See* AR 40.)  "[A]n ALJ may usually reject a physician's opinion when it lacks support from objective medical findings or relies upon the properly discounted subjective reports of a claimant." *Smith v. Berryhill*, 752 F. App'x 473, 475 (9th Cir. 2019) (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1216–17 (9th Cir. 2005); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (holding that a medical opinion based on subjective complaints could be properly rejected where the subjective complaints themselves had been refuted).

[12] Plaintiff also criticizes the ALJ's evaluation of Dr. Salvo's opinion that it would be "impossible for [Plaintiff] to maintain gainful employment because of her need for office visits, IV therapies, and because of the symptoms of her autonomic dysfunction, and lupus."  (Doc. 18 at 28 (citing AR 731).)  As noted above, because opinion is directed to an issue reserved to the Commissioner, it is therefore neither "valuable nor persuasive" evidence and need not be considered by the ALJ.  20 C.F.R. § 404.1520b(c)(3).

**B.      The ALJ Did Not Err in Assessing Plaintiff's RFC**

      **1.      Legal Standard**

Before proceeding to step four, the ALJ must first determine the claimant's RFC. *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at \*2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. § 404.1545(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(2); Social Security Ruling ("SSR") 96–8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews*, 53 F.3d at 1039–40.

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

Where a claimant alleges a mental impairment, steps two and three require the ALJ to apply the psychiatric review technique outlined at 20 C.F.R. § 404.1520a to determine the severity of the claimant's impairment at step two, and to determine whether the impairment satisfies Social Security regulations at step three. If the claimant is found to have a medically determinable mental impairment, the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the

24

presence of the impairment(s)," then "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of [Section 404.1520a,]," which specifies four broad functional areas: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. 20 C.F.R. § 404.1520a(b), (c)(3). The four functional areas are known as the "paragraph B" criteria.

The functional limitations are rated on a five-point scale of "[n]one, mild, moderate, marked, [or] extreme," 20 C.F.R. § 404.1520a(c)(4). An impairment causing no more than mild limitations in any area is generally considered a non-severe impairment. 20 C.F.R. § 404.1520a(d)(1). If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine the claimant's RFC. The RFC determination is thus distinct from the psychiatric review technique (and consideration of the "four broad functional" areas) though the discussion often overlaps.

**2.    Analysis**

Here, in performing the psychiatric review technique, the ALJ found that Plaintiff had no limitations in (1) interacting with others and adapting or (2) managing oneself, and mild limitations in (3) understanding, remembering, or applying information, and (4) concentrating, persisting, or maintaining pace. (AR 20–21.) Relevant here, consultative examiner Dr. Eisen opined that Plaintiff had moderate limitations in interacting with coworkers and the public, in performing work activities on a consistent basis, in maintaining regular attendance and completing a normal workday/workweek, and in dealing in usual stress encountered in the workplace. (AR 1875.) Dr. Eisen further assessed a mild level of limitation in Plaintiff's ability to perform both simple and repetitive tasks, detailed and complex tasks, and in her ability to accept instructions from supervisors. (AR 1875.).

While the ALJ found Dr. Eisen's assessment of Plaintiff's cognitive functioning "supported" by the examination and the medical record, they found the assessment of Plaintiff's "ability to deal with stressors, maintain attendance, complete tasks, and interact with others was less well supported." (AR 26.) The undersigned finds this conclusion was supported by substantial evidence. *Woods*, 32 F.4th at 787. As to supportability, the ALJ determined that Plaintiff's demeanor at the consultative examination, cooperative and normal eye contact, as well as her performance on mental status tests undermined Dr. Eisen's opined moderate limitations. (AR 26 (citing AR 1874).) The ALJ also

observed that Dr. Eisen "provided no accompanying narration to support his findings related to moderate limitations" (AR 26). A lack of supporting explanation is a proper consideration in evaluating the supportability. *See* 20 C.F.R. § 404.1520c(c)(1); *Woods*, 32 F.4th at 794 (substantial evidence supported finding that medical opinion was "not persuasive because it is not supported by any explanation"); *Ponce v. Comm'r of Soc. Sec.*, No. 1:20-CV-01664-EPG, 2022 WL 196529, at *3 (E.D. Cal. Jan. 21, 2022) (declining to find the ALJ erroneously rejected medical opinion where there was "no significant narrative explanation" and "no citation to record evidence.").

The ALJ also found Dr. Eisen's moderate ratings were not consistent with Plaintiff's functioning as reflected in the medical evidence. (AR 26.) The ALJ cited "repeated" normal mental status findings in the record throughout the relevant period showing Plaintiff being "cooperative, with normal mood and affect, and alert and oriented in all three spheres." (AR 26 (citing AR 1048 (March 2018: denied depression, anxiety, and suicidal thoughts, noted to be pleasant, alert, and oriented, with appropriate speech and no confusion); AR 1034 (May 2018: denied anxiety, depression, and sleep difficulties, and examination showed normal mood and affect, alert and oriented, and normal judgment and insight); AR 1056–57 (July 2019: pleasant, alert, and oriented, with appropriate speech and no confusion); AR 1549 (June 2021: well-groomed appearance; pleasant, alert, and cooperative behavior); AR 1702 (July 2021: appropriate mood and affect); AR 2155 (December 2021: cooperative with normal mood and affect); AR 2519 (January 2022: good judgment, normal mood and affect)).) Dr. Eisen's moderate ratings were also inconsistent, as the ALJ observed, with the State agency consulting expert opinions, who found no more than mild limitations in the paragraph B criteria. (AR 26 (citing AR 218, 242–43).) The ALJ further pointed to a lack of evidence of Plaintiff having missed medical appointments or failed to follow medical advice as further undermining Dr. Eisen's opinion. (AR 26.)

Plaintiff does not dispute the foregoing evidence, which is supported by the record. Instead, she advocates for a more favorable interpretation of it. (*See* Doc. 18 at 32–33, 34; Doc. 25 at 5–6.) But, as indicated above, the fact that the evidence could be interpreted differently, *e.g.*, in a manner more favorable to Plaintiff, is of no consequence, as the undersigned will not second guess the ALJ's reasonable interpretation and conclusion drawn therefrom. *See Andrews* 53 F.3d at 1039–40; *Batson*,

26

359 F.3d at 1198.

Plaintiff also criticizes the ALJ for noting that Dr. Eisen "relied heavily on [Plaintiff's] subjective reports of being isolative, due to embarrassment of her physical condition." (Doc. 18 at 33 (quoting *Ferrando v. Comm'r of Soc. Sec. Admin.*, 449 F. App'x 610, 612 n.2 (9th Cir. 2011).) Indeed, *Ferrando* discourages an ALJ's discrediting of "a mental health professional's opinion solely because it is based to a significant degree on a patient's 'subjective evaluations.'" 449 F. App'x at 612 n.2. But in that case, the ALJ gave no adequate reason to discount the plaintiff's subjective statements and thus could not "rely on any defect in those 'subjective allegations' to discredit the treating psychiatrist." *Id.* at 612. In contrast, the ALJ here found Plaintiff's subjective symptom statements "not entirely consistent" with the evidence in the record (AR 30), which she has not challenged on appeal. Moreover, the ALJ did not discredit Dr. Eisen's opined moderate limitations "solely" because they were based on Plaintiff's subjective symptoms, further distinguishing *Ferrando*.[13] *See Williams v. Berryhill*, No. EDCV 17-0755-JPR, 2018 WL 2670655, at *9 (C.D. Cal. June 4, 2018); *see also Villalobos v. Comm'r of Soc. Sec.*, No. 2:23-cv-1891 SCR, 2025 WL 958584, at *6, 8-9 (E.D. Cal. Mar. 31, 2025).

Finally, Plaintiff suggests that the RFC is not supported by substantial evidence because the ALJ failed to "properly consider all [Plaintiff's] symptoms," including "syncope, difficulty concentrating, dizziness, brain fog, and fatigue." (Doc. 18 at 34–35.) Regardless of severity, all medically determinable impairments are indeed considered when assessing a claimant's RFC prior to step four. 20 C.F.R. § 404.1545(a)(2). There is no requirement, however, that the ALJ do so under any particular heading of their opinion, and "[d]istrict courts in this circuit have generally declined to find reversible error when an ALJ found the claimant's mental impairments to be non-severe at step two and considered related, additional evidence of the claimant's mental impairments at step four."

---

[13] Even if the ALJ did err in discrediting Dr. Eisen's opinion because it was overly reliant on self-reports, the error was harmless because the ALJ provided other legitimate bases for finding the opinion unpersuasive. *See Woods*, 32 F.4th at 792–93 (affirming the ALJ's rejection of a medical opinion based on an inconsistency finding alone); *Molina*, 674 F.3d at 1115 (an error is harmless where it is inconsequential to the determination and the decision remains valid and supported by substantial evidence); *Reed v. Saul*, 834 F. App'x 326, 329 (9th Cir. 2020) ("To the extent the ALJ erred in discounting the opinions of Dr. Cochran because her opinions were based in part on Reed's self-reports of his symptoms, that error is harmless because the ALJ offered multiple other specific and legitimate reasons for discounting Dr. Cochran's opinions.").

*Denney v. Saul*, No. 1:18-CV-00689-GSA, 2019 WL 4076717, at *8 (E.D. Cal. Aug. 29, 2019) (collecting cases).

That is precisely what the ALJ did here.  At step two, the ALJ performed the psychiatric review technique for evaluation of mental impairments, found that they cause no more than mild limitations in the four broad categories of functionality, and concluded that the impairments were therefore non-severe.  (AR 23–27.)  The ALJ considered related evidence again at step four— including evidence of syncope (AR 29–32, 36–37, 39–40), difficulty concentrating (AR 29), and fatigue (29–31, 36)—but declined to include any mental limitations in the RFC.  Thus, the ALJ did consider Plaintiff's non-severe mental impairments in reaching the RFC.  (*See* AR 23 ("The undersigned considered all of [Plaintiff's] medically determinable impairments, including those that are not severe, when assessing [Plaintiff's RFC].").)  To the extent that Plaintiff contends that mild limitations were required to be included in the RFC, such argument is contrary to case law.  *See Stoy v. O'Malley*, No. 1:24-CV-00131-GSA, 2024 WL 4752438, at *5 (E.D. Cal. Nov. 12, 2024) ("Simply put, there is no requirement that mild limitations be incorporated into the RFC.") (citing *Woods,* 32 F.4th at 794); *see also Brown v. Comm'r of Soc. Sec.*, No. 2:24-CV-02781-DAD-SCR, 2025 WL 3470255, at *8 (E.D. Cal. Dec. 3, 2025) (noting courts "have consistently followed *Woods* in finding that ALJs are not required to incorporate 'mild' limitations in the RFC.") (collecting cases); *Saul R. v. O'Malley*, Case No. EDCV 23-01232-FWS (AS), 2024 WL 3641041, at *2–3 (C.D. Cal., July 3, 2024) ("[T]he ALJ was not required to include the mild mental limitations in the RFC because, as the ALJ noted, the record did not reflect that Plaintiff's mental impairment caused a significant limitation in his ability to work.").

In sum, the undersigned finds no error in the ALJ's RFC assessment.  Plaintiff may disagree with the RFC, but the undersigned must nevertheless uphold the ALJ's determination because it is a rational interpretation of the record that is supported by substantial evidence.  *See Ford*, 950 F.3d at 1159; *Thomas*, 278 F.3d at 954.

## V.      FINDINGS AND RECOMMENDATIONS

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1.      Plaintiff's motion for summary judgment (Doc. 18) be DENIED;

2.    The final decision of the Commissioner of Social Security be AFFIRMED; and

3.    The Clerk of Court be DIRECTED to enter judgment in favor of Defendant Frank Bisignano, Commissioner of Social Security, and against Plaintiff Jennifer Lee Lafavor, and to CLOSE this action.

These findings and recommendations are submitted to the District Judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within **fourteen (14) days** of service of these recommendations, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

The District Judge will review the Magistrate Judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **May 18, 2026**                            /s/ *Sheila K. Oberto*
                                                  UNITED STATES MAGISTRATE JUDGE

29